# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DAISEY TRUST, et al., | Case No.: 2:23-cv-00978-APG-EJY |
| Plaintiffs | **Order (1) Granting the Defendants' Motion to Dismiss and (2) Denying the Plaintiffs' Motion to Amend** |
| v. | |
| FEDERAL HOUSING FINANCE AGENCY, et al., | [ECF Nos. 36, 52] |
| Defendants | |

Defendant Federal Housing Finance Agency (FHFA) is a federal agency that regulates, and acts as conservator for, the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac). Plaintiffs Daisey Trust; Cape Jasmine Court Trust; and Saticoy Bay LLC, Series 10007 Liberty View own or used to own property in Nevada in which the FHFA (through Fannie Mae or Freddie Mac) has an interest and has threatened or completed a foreclosure on the property. The plaintiffs bring this putative class action against the FHFA and its director Sandra L. Thompson asserting that the way the FHFA is funded violates the United States Constitution's Appropriations Clause and the non-delegation doctrine. The plaintiffs thus contend that the FHFA lacks authority to foreclose on their properties because it cannot constitutionally take any action unless the alleged constitutional defects are corrected. They also bring a claim for wrongful foreclosure under Nevada law based on the same grounds. They seek class-wide injunctive relief against future foreclosures, an order setting aside past foreclosures, various forms of declaratory judgment, damages, and attorney's fees and costs.

The FHFA and Thompson move to dismiss on a variety of grounds, including lack of standing, claim preclusion, lack of subject matter jurisdiction, and that the plaintiffs' claims fail on the merits as a matter of law.  The plaintiffs oppose dismissal and seek leave to amend.  The FHFA and Thompson oppose amendment.[1]

I grant the defendants' motion to dismiss because the plaintiffs' claims fail on the merits as a matter of law.  I deny the plaintiffs' motion to amend because amendment would be futile.

# I.  BACKGROUND[2]

## A.  The FHFA

Congress created the FHFA in 2008 when it passed, and the President signed, the Housing and Economic Recovery Act (HERA). ECF No. 34 at 6; *see also* 12 U.S.C. § 4511(a). Under HERA, the FHFA is an "independent agency of the Federal Government." 12 U.S.C. § 4511(a).  It is "charged with regulating the federal housing mortgage market, including Fannie Mae and Freddie Mac." ECF No. 34 at 6-7; *see also* 12 U.S.C. § 4511(b).  "Fannie Mae and Freddie Mac are for-profit stockholder owned corporations organized and existing under the Federal Home Loan Corporation Act" that "buy and sell mortgages, often pooling them into mortgage-backed securities for investors." ECF No. 34 at 7; *see also* 12 U.S.C. §§ 1451; 1716.

In creating the FHFA, HERA delineated how the agency was to be funded. ECF No. 34 at 7-8.  The FHFA's director "shall establish and collect from the regulated entities annual assessments in an amount not exceeding the amount sufficient to provide for reasonable costs (including administrative costs) and expenses of the Agency." 12 U.S.C. § 4516(a).  That amount

---

[1] The FHFA and Thompson also move for an order expunging a lis pendens recorded by a non-party that is controlled by the same person who controls the plaintiffs in this case: Iyad "Eddie" Haddad. ECF No. 44.  I will address that motion by separate order.

[2] The facts are taken from the first amended complaint and the statutes cited therein.

includes "such amounts in excess of actual expenses for any given year as deemed necessary by the Director to maintain a working capital fund in accordance with subsection (e)." *Id.* § 4516(a)(3). Subsection (e) allows FHFA's director to maintain a working capital fund in an "amount the Director deems necessary." *Id.* § 4516(e). The director may adjust the assessment amounts "as necessary" in her discretion, "to ensure that the costs of enforcement activities under [HERA] for a regulated entity are borne only by such regulated entity" and may collect an "immediate assessment" to cover increased costs of supervision of, or enforcement activities against, that regulated entity. *Id.* §§ 4516(c)(2)-(3). FHFA's director may use the assessed funds to compensate the director and other FHFA employees, and for "all other" FHFA expenses. *Id.* § 4516(f)(4).

If there is a surplus from these increased assessments, it must be "deducted from the assessment for such regulated entity for the following semiannual period." *Id.* § 4516(c)(3). The annual assessments are similarly subject to having a surplus applied to the next year's assessments. *Id.* § 4516(d). HERA provides that the amounts the FHFA receives "from any assessment under this section shall not be construed to be Government or public funds or appropriated money." *Id.* § 4516(f)(2). FHFA's director "may request the Secretary of the Treasury to invest such portions of amounts received by the Director from assessments paid under this section that, in the Director's discretion, are not required to meet the current working needs of the Agency." *Id.* § 4516(f)(6).

The FHFA must provide the Office of Management and Budget (OMB) copies of its "financial operating plans and forecasts," as well as quarterly reports on the FHFA's "financial condition and results of operations." *Id.* § 4516(g)(1). It must annually prepare a statement of its assets and liabilities, whether it has a surplus or deficit, its income and expenses, and the

1  "sources and applications of [its] funds." *Id.* § 4516(g)(2).  It also must set up internal controls

2  and report to the Comptroller General of the United States regarding those internal controls. *Id.*

3  § 4516(g)(4).  However, the FHFA does not have to obtain the OMB's consent or approval "with

4  respect to any report, plan, forecast, or other information," nor does OMB have "any jurisdiction

5  or oversight over the [FHFA's] affairs or operations." *Id.* § 4516(g)(5).

6       The Comptroller General must annually audit the FHFA's financial transactions, and

7  representatives of the Government Accountability Office (GAO) have access to the FHFA's

8  books and personnel "to facilitate the audit." *Id.* § 4516(h)(1); *see also id.* § 4524 (providing that

9  the GAO may audit the FHFA's operations and the FHFA's books and records "shall be made

10 available to the Comptroller General").  The Comptroller must submit an annual report to

11 Congress regarding the audit, including recommendations that the Comptroller General "may

12 deem advisable." *Id.* § 4516(h)(2).  The report is also provided to the President and the FHFA.

13 *Id.*

14      HERA authorized the FHFA to put Fannie Mae and Freddie Mac (the Enterprises) into a

15 conservatorship, which the FHFA did in September 2008. *See Fed. Home Loan Mortg. Corp. v.*

16 *SFR Invs. Pool 1, LLC*, 893 F.3d 1136, 1140 (9th Cir. 2018) ("Exercising a power provided by

17 [HERA], on September 6, 2008, FHFA's Director placed the Enterprises under the Agency's

18 conservatorship."); *see also* 12 U.S.C. § 4617(a) (allowing FHFA's director to appoint the FHFA

19 "as conservator . . . for a regulated entity").  By placing the regulated entities into

20 conservatorship, FHFA succeeded to Fannie Mae and Freddie Mac's "rights, titles, powers, and

21 privileges . . . with respect to [their] assets." 12 U.S.C. § 4617(b)(2)(A)(i).

22 / / / /

23 / / / /

**B.  The Plaintiffs**

Plaintiff Cape Jasmine Court Trust owns property located at 167 Desert Pond Avenue in Henderson, Nevada, following a foreclosure sale conducted by a homeowners association (HOA) in 2012. ECF No. 34 at 10.  The property is encumbered by a deed of trust that is owned by Fannie Mae or Freddie Mac, but as of the date the first amended complaint (FAC) was filed, a notice of default under the deed of trust had not yet been recorded against the property. *Id.*

Plaintiff Daisey Trust owned property located at 33 Newburg Avenue in North Las Vegas, Nevada, following an HOA foreclosure sale in 2012. *Id.* at 11.  The property was encumbered by a deed of trust that Fannie Mae owns. *Id.*  In September 2023, "the FHFA directly and/or indirectly directed and controlled a foreclosure sale on the Newburg Property." *Id.*  Daisey Trust spent additional funds beyond those it spent at the HOA foreclosure sale to purchase the property at the FHFA's foreclosure sale. *Id.*

Plaintiff Saticoy Bay owned property located at 10007 Liberty View Way in Las Vegas, Nevada. *Id.* at 12.  The property was encumbered by a deed of trust that was owned by Freddie Mac or Fannie Mae. *Id.*  In 2022, FHFA's loan servicer for this loan foreclosed on the property at FHFA's "direction and control." *Id.*  The property was sold to an entity that is not a party to this case. *Id.* at 12-13.

The plaintiffs contend that each of the actual or threatened foreclosures is invalid because the FHFA is unconstitutionally funded.  First, they assert that FHFA's funding mechanism violates the Appropriations Clause because the FHFA is funded through assessments from the entities it regulates, it sets its own budget, there is no cap or limit to the amount it can collect, and it spends collected funds "without congressional oversight or any democratic accountability." *Id.* at 14.  The plaintiffs allege that "[a]ll FHFA actions as related to foreclosure

sales taken without a constitutional appropriation from Congress are void, unlawful, and must be declared so and be set aside." *Id.* at 15.

Second, the plaintiffs allege that HERA violates separation of powers and the non-delegation doctrine because it provides the FHFA with "unbounded powers to determine its funding and spending without providing an intelligible principle to guide the exercise of its vast discretion." *Id.* at 16. The plaintiffs allege that the standard of "reasonable costs" is not an intelligible principle because the FHFA's director "retains boundless discretion to determine" reasonableness. *Id.* at 17. Finally, the plaintiffs assert a wrongful foreclosure claim under state law, alleging that because FHFA's funding mechanism violates the Appropriations Clause and the non-delegation doctrine, any foreclosures were wrongful. *Id.* at 18.

For the two federal claims, the plaintiffs seek injunctive relief to prohibit future foreclosures, declaratory relief to set aside completed foreclosures, and compensatory damages for themselves and those similarly situated who were foreclosed on and either did not buy the property or had to spend additional funds to keep the property. *Id.* at 15, 17, 19. For the wrongful foreclosure claim, the plaintiffs seek compensatory damages for the completed foreclosures. *Id.* at 18-19.

**C. Procedural History**

Daisey Trust initially was the only plaintiff in this case. ECF No. 1. It moved for injunctive relief to stop an impending foreclosure sale of its Newburg property. ECF Nos. 2; 3. In support of that motion, Daisey Trust relied heavily on a Fifth Circuit case, *Community Financial Services Association of America, Limited v. Consumer Financial Protection Bureau*, which found that the funding mechanism of the Consumer Financial Protection Bureau (CFPB), which has some similarities to FHFA's funding mechanism, violated the Appropriations Clause.

51 F.4th 616, 642 (5th Cir. 2022).  The Supreme Court of the United States granted certiorari to hear the case on February 27, 2023. *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 143 S. Ct. 978 (2023).

I held a hearing on the motion for injunctive relief in September 2023. ECF Nos. 31; 32. I denied the motion because I found that Daisey Trust was not likely to succeed on the merits of its claims, as I concluded that cases from the Second and D.C. Circuits were more persuasive than the Fifth Circuit's decision. ECF No. 32 at 92-94; *see also Consumer Fin. Prot. Bureau v. L. Offs. of Crystal Moroney, P.C.*, 63 F.4th 174 (2d Cir. 2023); *PHH Corp v. The Consumer Fin. Prot. Bureau*, 881 F.3d 75 (D.C. Cir. 2018), *overruled in part on other grounds by Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 205 (2020).  I also commented that Daisey Trust may have a problem with claim preclusion. ECF No. 32 at 92-93.  At the time, the defendants' first motion to dismiss the original complaint was still pending. *Id.* at 94.  Given that I denied the motion to enjoin the foreclosure sale, and in light of the discussion at the hearing, I directed the parties to consider next steps in the case and to provide a status report. *Id.* at 105-08.

The parties thereafter agreed that Daisey Trust could file an amended complaint, which Daisey Trust did. ECF Nos. 33 at 2; 34.  The FAC added as plaintiffs Cape Jasmine and Saticoy Bay, and it proposed a putative class action. ECF No. 34.  In light of the FAC, I denied the original motion to dismiss as moot. ECF No. 35.  The defendants then moved to dismiss the FAC. ECF No. 36.

After the briefing was completed on the second motion to dismiss, the Supreme Court of the United States issued its decision in *Consumer Financial Protection Bureau v. Community Financial Services Association of America, Limited*, 601 U.S. 416 (2024) (*CFSA*).  The Supreme

1  Court reversed the Fifth Circuit's decision and held that the CFPB's funding mechanism

2  complied with the Appropriations Clause. *Id.* at 421.

3      I immediately directed the parties to "confer about how the decision impacts this case,

4  and whether it requires amendment of the first amended complaint, withdrawal and refiling of

5  the pending motion to dismiss, or some other action." ECF No. 43 at 1.  I ordered the parties to

6  "file a joint status report on how the case should proceed in light of this new authority." *Id.*

7      The parties filed a joint status report in which the plaintiffs proposed to file a second

8  amended complaint to focus their allegations on the major difference between CFPB's funding

9  mechanism and the FHFA's: the existence of a spending cap in CFPB's funding mechanism.

10  ECF No. 45 at 3.  The plaintiffs conceded that the FAC and the motion to dismiss briefs already

11  addressed this issue. *Id.*  The plaintiffs nevertheless wanted to amend because the lack of a cap

12  was not their central argument before *CFSA* and because *CFSA* narrowed the issues I would need

13  to resolve, thus rendering some of the prior briefing superfluous. *Id.*  The defendants opposed

14  amendment because the FAC already alleges an Appropriations Clause violation, and an

15  amendment to more precisely articulate a legal theory is unnecessary. *Id.* at 4.  Additionally, the

16  FHFA agreed that the parties' briefs related to the dismissal motion already address the lack of a

17  funding cap. *Id.*  The defendants argued an amendment would only delay resolution and increase

18  expenses with another round of briefing. *Id.*  I ordered the parties to file supplemental briefs on

19  *CFSA*'s impact on this case, and the parties did. ECF Nos. 48; 51; 54; 56-57.  The plaintiffs also

20  moved to amend, which the defendants opposed. ECF Nos. 52; 55.  Consequently, the motions

21  currently pending before me are the defendants' motion to dismiss the FAC, the plaintiffs'

22  motion to amend, and the defendants' motion to expunge the lis pendens and for injunctive

23  relief.  In this order, I address the motions to dismiss and for leave to amend.

## II.  MOTION TO DISMISS (ECF No. 36)

In considering a motion to dismiss, I take all well-pleaded allegations of material fact as true and construe the allegations in a light most favorable to the non-moving party. *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).  However, I do not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1163 (9th Cir. 2017).  A plaintiff must make sufficient factual allegations to establish a plausible entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Such allegations must amount to "more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action." *Id.* at 555.

### A.  Standing

The defendants argue that the plaintiffs lack Article III standing because they plead no cognizable injury where the foreclosures are proper under the loan documents and Nevada law. The defendants contend that it is the plaintiffs' failure to pay off the loan, not the FHFA's funding mechanism, that results in the foreclosures, and the plaintiffs cannot create their own injury by failing to pay off the loan and letting the properties face foreclosure.  The defendants also argue that any injury from the foreclosures is not traceable to the FHFA or Thompson's actions because regardless of the funding mechanism for the FHFA, Fannie Mae and Freddie Mac (and/or their loan servicers) would still be entitled to use their own funds to foreclose.  The defendants argue that to make a constitutional challenge to a federal agency's funding mechanism, the plaintiffs must show that the agency action would not have been taken but for the funding mechanism, but the plaintiffs cannot make that showing here because the loans were subject to foreclosure before the FHFA was created or the Enterprises went into conservatorship. FHFA also contends that it is not involved in the day-to-day foreclosure activity and has instead

determined to allow the Enterprises to handle foreclosure activity.  And the defendants contend that the plaintiffs' claims are based on how the FHFA spends its money, not how it raises it, so there is no connection between the alleged violation and the plaintiffs' injuries.  They argue that to the extent that the plaintiffs' claim is now narrowed to the lack of a spending cap in FHFA's funding mechanism, there is no connection between that alleged defect and the foreclosures because there is no basis to conclude that if FHFA had a spending cap, the ability to conduct foreclosures would be one of the things that FHFA would not expend funds on.  Finally, the defendants argue that the mismatch between the plaintiffs' injuries and their challenge to FHFA's funding mechanism means their claims are not redressable.

The plaintiffs respond that they have rights in the properties they own and thus suffer an injury in fact when their ownership interests are jeopardized or extinguished through foreclosure, and through having to pay more money to keep their properties if they want to avoid foreclosure. They contend that they suffer these injuries when FHFA lacks a constitutional source of funds to carry out the foreclosures, even if the foreclosures would otherwise be lawful.  The plaintiffs argue that their injuries are traceable to FHFA's conduct of "unconstitutionally raising and spending unappropriated funds to control and direct" foreclosures. ECF No. 39 at 17.  The plaintiffs argue that the FHFA cannot divorce itself from the day-to-day foreclosure activities because under HERA, it succeeded to all the Enterprises' rights and powers, so the Enterprises' foreclosure rights now belong to the FHFA.  The plaintiffs contend that in other litigation, Fannie Mae has asserted that the FHFA regulates its mortgage and foreclosure activities.  And the FHFA has made public statements indicating that it has decision-making authority over foreclosures.  The plaintiffs assert that their injuries are redressable in the form of injunctive relief to stop future foreclosures, declaratory relief setting aside completed foreclosures, and

1   damages.  Finally, they argue that excising the funding mechanism from the statute does not

2   solve the problem because without properly appropriated funds, the FHFA cannot take any

3   foreclosure actions.

4          To have Article III standing, the plaintiffs must show "(1) that they have suffered an

5   injury in fact, (2) that their injury is fairly traceable to a defendant's conduct, and (3) that their

6   injury would likely be redressed by a favorable decision." *Mecinas v. Hobbs*, 30 F.4th 890, 896

7   (9th Cir. 2022).  Because this case is at the pleading stage, the plaintiffs may meet their burden

8   of showing standing through "general factual allegations of injury resulting from the defendant's

9   conduct." *Id.* at 897 (quotation omitted).

10         To allege an "injury in fact," the plaintiffs' injury "must be concrete and particularized

11  and actual or imminent, not conjectural or hypothetical." *Id.* (quotation omitted).  "The fairly

12  traceable and redressability components for standing overlap and are two facets of a single

13  causation requirement." *Id.* at 899 (simplified).  "However, they are distinct in that traceability

14  examines the connection between the alleged misconduct and injury, whereas redressability

15  analyzes the connection between the alleged injury and requested relief." *Id.* (quotation omitted).

16  Thus, to "establish traceability, there must be a causal connection between the injury and the

17  conduct complained of—the injury has to be fairly traceable to the challenged action of the

18  defendant, and not the result of the independent action of some third party not before the court."

19  *Id.* (quotation omitted).  Finally, "redressability analyzes the connection between the alleged

20  injury and requested judicial relief." *Tucson v. City of Seattle*, 91 F.4th 1318, 1325 (9th Cir.

21  2024).  For redressability, the question "is not whether a favorable decision is likely but whether

22  a favorable decision likely will redress a plaintiff's injury." *Id.* (simplified).  In other words, an

23  injury is redressable if "the district court had the power to prevent the injury at the time the

1  complaint was filed." *Id.* (quotation omitted).  The "plaintiff's burden to demonstrate

2  redressability is relatively modest." *Id.* (quotation omitted).

3      The plaintiffs have plausibly alleged injuries-in-fact.  Two of the plaintiffs' properties

4  have been foreclosed on and the other is likely to face foreclosure soon.  Although the

5  defendants argue this is self-inflicted harm because the plaintiffs could pay off the loans, the

6  plaintiffs were not the original borrowers, and they owe nothing on the loans.  True, they bought

7  the properties subject to the deeds of trust, and thus could pay off the loans and save their

8  properties from foreclosure.  But that does not mean they suffer no injury when an agency that

9  allegedly lacks a constitutional source of funds takes action that would otherwise be lawful, as

10  the plaintiffs assert the defendants have done or will soon do.

11      The plaintiffs also have plausibly alleged traceability because they can trace their injuries

12  to the defendants' alleged unlawful conduct of collecting and spending funds that they obtained

13  in violation of the Constitution to direct and conduct foreclosures.  I agree with the defendants

14  that the plaintiffs' injuries are not directly traceable to the FHFA's funding mechanism because

15  prior to the FHFA's existence, Fannie Mae and its servicers could have foreclosed on the

16  properties under the deeds of trust.  HERA's enactment created the FHFA and gave the FHFA

17  the power to put Fannie Mae and Freddie Mac into conservatorship.  If the plaintiffs are correct

18  that FHFA was unconstitutionally funded such that it could take no action without violating the

19  Appropriations Clause and the non-delegation doctrine, then the FHFA could not have put

20  Fannie Mae or Freddie Mac into conservatorship in the first place.  In that case, the Enterprises

21  would exist outside FHFA's conservatorship and could foreclose.[3]  On the other hand, if the

22

23

---

[3] The FAC alleges that "FHFA's self-funding structure must be declared unconstitutional and

1   plaintiffs are incorrect about the FHFA's funding mechanism being unconstitutional, then the

2   FHFA (through the Enterprises and their servicers) can foreclose.  Either way, the plaintiffs'

3   properties are subject to foreclosure.

4           However, the Supreme Court has held that to establish standing, a plaintiff must trace its

5   injury to the defendant's "allegedly unlawful conduct . . ., not to the provision of law that is

6   challenged." *Collins v. Yellen*, 594 U.S. 220, 243 (2021) (quotation omitted).  In *Yellen*,

7   shareholders of the Enterprises challenged an agreement the FHFA made with the Department of

8   Treasury based, in part, on the argument that FHFA's director was unconstitutionally insulated

9   from removal by the President. *Id.* at 227.  The Supreme Court rejected the argument that the

10  shareholders' financial injuries were not traceable to the removal restriction because "the

11  relevant action in this case is the [challenged agreement], and because the shareholders' concrete

12  injury flows directly from that [agreement], the traceability requirement is satisfied." *Id.* at 243-

13  44.  The Supreme Court did not require the challengers to show that but for the removal

14  restriction, they would not have been injured for standing purposes. *See id.*

15          Similarly, here, the plaintiffs allege that their injuries stem from the defendants' alleged

16  unlawful conduct of directing and conducting foreclosures by expending funds that were not

17  validly appropriated.  Under *Yellen*, even if the plaintiffs are subject to foreclosure regardless of

18  the funding mechanism in a practical sense, they have standing because they can trace their

19  injuries to the defendants' alleged conduct of spending unlawfully appropriated funds to

20

21

22

23  all unconstitutional actions that flow from it must be declared unlawful, set aside, and enjoined."
    ECF No. 34 at 2.  That necessarily would include setting aside the conservatorships of the
    Enterprises.

                                                    13

foreclose.[4]  The defendants do not attempt to distinguish *Yellen* or explain why that case would

not support standing in this case.  The cases the defendants cite discuss what remedy to employ

after a constitutional defect is found, not whether the plaintiff had standing to bring the claim.

*See CFPB v. L. Offs. of Crystal Moroney, P.C.*, 63 F.4th 174, 179-80 (2d Cir. 2023); *CFSA*, 51

F.4th at 643.  Finally, the plaintiffs' injuries are redressable through their requested declarations,

injunctions, and damages.  I therefore deny the defendants' motion to dismiss for lack of

standing.

## B.  Section 4617(f)

The defendants argue that I lack jurisdiction to grant the plaintiffs' requested injunctive

relief because 12 U.S.C. § 4617(f) provides that "no court may take any action to restrain or

affect the exercise of powers or functions of [FHFA] as a conservator or receiver."  They

contend that because the FHFA is acting as a conservator over the Enterprises, an order enjoining

foreclosures would violate this statutory command.  The defendants contend that the alleged

constitutional violations do not nullify § 4617(f) because if FHFA's funding mechanism violates

the Constitution, the proper remedy is to excise the funding mechanism, not to invalidate the

entire statute.  The defendants assert that FHFA's powers as conservator are not dependent on

the funding mechanism, so even if that violates the Constitution, it should be severed from the

other parts of the statute that allow it to act as conservator.

The plaintiffs respond that § 4617(f) does not bar their claims because, under *Yellen*, the

statute bars relief where the FHFA acted within its authority but permits a plaintiff to pursue a

claim that the FHFA exceeded its authority.  The plaintiffs contend that the FHFA exceeds its

---

[4] To the extent FHFA seeks to distance itself from the day-to-day foreclosure activities or asserts that the Enterprises and servicers use their own funds and not appropriated funds to foreclose, those arguments rely on facts outside the FAC, so I do not consider them at this stage.

1    authority by raising and expending funds in violation of the Appropriations Clause and the non-

2    delegation doctrine.  Additionally, they argue that § 4617(f) does not clearly evince

3    congressional intent to preclude judicial review of constitutional claims.

4         HERA provides that unless review is specifically authorized by one of its provisions or

5    the director requests it, "no court may take any action to restrain or affect the exercise of powers

6    or functions of the Agency as a conservator or a receiver." 12 U.S.C. § 4617(f ).  This provision

7    "prohibits relief where the FHFA action at issue fell within the scope of the Agency's authority

8    as a conservator, but . . . relief is allowed if the FHFA exceeded that authority." *Collins v. Yellen*,

9    594 U.S. at 237.  Thus, if "the FHFA does not exercise but instead exceeds those powers or

10   functions, [§ 4617(f)] imposes no restrictions." *Id.*

11        FHFA exercises its powers as conservator by directing and conducting foreclosures

12   because by placing the Enterprises into conservatorship, it succeeded to the Enterprises' rights

13   and powers, including the right and power to foreclose. *See* 12 U.S.C. § 4617(b)(2)(A)(i).  Thus,

14   § 4617(f) would bar this suit if the plaintiffs were solely bringing a statutory claim. *See Yellen*,

15   594 U.S. at 237.  However, in *Yellen*, the Supreme Court considered a challenge to the

16   constitutionality of the removal provision of the FHFA's director despite finding that a statutory

17   challenge was barred by § 4617(f). *Id.* at 242, 250-53.  Thus, § 4617(f) does not bar

18   constitutional claims even where the FHFA exercised its powers as conservator.[5]

19        To the extent § 4617(f) is jurisdictional,[6] I have jurisdiction to consider the plaintiffs'

20   constitutional claims for injunctive relief.  Because I have jurisdiction to review the plaintiffs'

21

22   [5] FHFA is subject to constitutional claims in its role as conservator because its authority derives
     from HERA.  It must interpret HERA in deciding what it can and cannot do, and its powers
23   under HERA differ from common law conservators. *See Yellen*, 594 U.S. at 253-54.

     [6] I take no position on whether § 4617(f) is jurisdictional as the defendants assert.

1  claims for at least one form of relief, I may reach the merits without deciding whether I also have

2  jurisdiction over the plaintiffs' damages claims[7] because I conclude the plaintiffs' claims fail as a

3  matter of law regardless of the type of relief requested.

4      **D.  Merits[8]**

5          1.  Appropriations Clause

6          The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury,

7  but in Consequence of Appropriations made by Law." Art. I, § 9, cl. 7.  The parties do not

8  dispute that FHFA's funding is subject to the Appropriations Clause.  They dispute only whether

9  FHFA's funding complies with that clause.

10         The defendants argue that the Appropriations Clause claim fails because, under *CFSA*,

11  the FHFA's funding mechanism must only identify a source of funds for designated purposes,

12  which HERA does.  The defendants argue that historical examples confirm that assessment-

13  based funding complies with the Appropriations Clause, as demonstrated by the Post Office Act

14  of 1792, and other agencies that are funded through assessments or fees.[9]  And they assert that

15  there is no additional requirement that the source of funds be subject to a spending cap.  They

16  contend that although the *CFSA* majority mentioned that the CFPB's funding statute included a

17  spending cap, *CFSA* did not hold that a cap is required for a valid appropriation.  The defendants

18  assert that this is confirmed by the dissent's critique that the majority's test for a valid

19

20  [7] The defendants offer numerous theories as to why I lack jurisdiction to consider the plaintiffs' damages claims.

21  [8] I decline to address the defendants' claim preclusion argument.  The plaintiffs' claims fail on the merits.

22
23  [9] The defendants point to the funding of the Federal Reserve, the Office of the Comptroller of the Currency, the National Credit Union Administration, the Federal Deposit Insurance Corporation, the Farm Credit Administration, the Public Company Accounting Oversight Board, the National Mint, and the Patent Office as examples of assessment- or fee-based funding.

appropriation does not require an upper limit, and the majority did not dispute that interpretation of its test under the Appropriations Clause.  And the defendants assert that the *CFSA* majority endorsed the CFPB's structure based on the historical example of two other entities that were funded from fees and commissions without a statutory cap: the Customs Service and the Post Office.  They also argue that if a cap was required, then the *CFSA* majority would have addressed the challengers' argument in that case that the cap for the CFPB was set so high as to be illusory, but it did not.

The plaintiffs concede that *CFSA* has narrowed the issues in this case.  But they argue that *CFSA* confirmed that a valid appropriation must be limited in amount by a sum certain or a cap.  They assert that unlike the CFPB, the FHFA has no cap on the amount of money it can raise or spend.  The plaintiffs contend this is a fatal flaw under the Appropriations Clause and *CFSA*.

The majority opinion in *CFSA* concluded that the CFPB's funding mechanism did not violate the Appropriations Clause. 601 U.S. at 421, 435.  The CFPB's funding mechanism is similar to the FHFA's with the notable exception of the CFPB having a spending cap.  The CFPB is funded by requisitioning from the Federal Reserve System's earnings an "amount its director deems 'reasonably necessary to carry out' the Bureau's duties, subject only to an inflation-adjusted cap." *Id.* (quoting 12 U.S.C. §§ 5497(a)(1), (2)).

The FHFA is similarly funded through annual assessments on the entities it regulates "in an amount not exceeding the amount sufficient to provide for [the FHFA's] reasonable costs." 12 U.S.C. § 4516(a).  HERA identifies some of those costs, including compensating the director and other FHFA employees of the agency, expenses for examinations, obtaining reviews and credit assessments, winding up affairs of certain entities, and maintaining a working capital fund. *Id.* §§ 4516(a)(1)-(4), 4516(f)(4).  With respect to the working capital fund, the director is

1 authorized to collect assessments greater than the FHFA's "actual expenses" in an amount she

2 "deem[s] necessary . . . to maintain a working capital fund." *Id.* §§ 4516(a)(3), (e).  The FHFA

3 may keep any surplus at the end of the year for which the assessments were collected, but the

4 FHFA must credit that amount to the Enterprises for the next year. *Id.* § 4516(d).  The director

5 also must remit to each regulated entity any surplus in the working capital fund that is "in excess

6 of the amount the Director deems necessary to maintain a working capital fund." *Id.* § 4516(e).

7 Unlike the CFPB, there is no hard cap on the amount the FHFA can raise and spend.

8        The FHFA is subject to audit and reporting requirements.  The FHFA must annually

9 report to the Comptroller General of the United States regarding the financial controls it has

10 established. *Id.* §§ 4516(g)(3), (4).  The Comptroller General must annually audit the FHFA's

11 financial transactions and submit a report to Congress and the President. *Id.* §§ 4516(h)(1), (2).

12 The Comptroller General has a statutory right to obtain the FHFA's books and records to

13 complete the annual audits, as well as for other audits of the FHFA that the Comptroller General

14 is authorized to conduct. *Id.* §§ 4516(h)(1), 4524.  In addition to the Comptroller General's

15 report to Congress, the FHFA must submit a report on its activities, including the "operations,

16 resources, and performance of the Agency." *Id.* § 4521(a)(6).

17        *CFSA* held that "appropriations need only identify a source of public funds and authorize

18 the expenditure of those funds for designated purposes to satisfy the Appropriations Clause." 601

19 U.S. at 426.  The *CFSA* majority's formulation of the rule, stated several times throughout the

20 opinion, does not include a cap or limit on raising or spending funds and instead reiterates that all

21 that is required is a source and a purpose.[10]  HERA satisfies those two requirements because it

22

23 ───────────────

[10] *See id.* at 427 ("Pre-founding history supports the conclusion that an identified source and
purpose are all that is required for a valid appropriation."); *id.* at 434 ("Postratification practice
therefore confirms our interpretation of the Appropriations Clause.  Early appropriations

1   identifies a source (assessments on regulated entities) and the purposes (FHFA's reasonable

2   expenses in exercising its statutory powers).

3          The *CFSA* majority opinion repeatedly references the fact that the CFPB's funding

4   mechanism includes a cap and that historically some appropriations were made in a sum certain

5   or subject to a cap. *See, e.g.*, *id.* at 421, 422-23, 431-32.  And the majority refers to the CFPB's

6   funding cap in rejecting the challengers' argument that the CFPB's funding was not "drawn . . .

7   in Consequence of Appropriations made by Law." *Id.* at 435-36 (quotation omitted).  The

8   majority rejected that argument because "Congress determined the amount of the Bureau's

9   annual funding by imposing a statutory cap," so the majority could not "conclude that Congress

10  violated the Appropriations Clause by permitting the Bureau to decide how much funding to

11  draw up to a cap." *Id.* at 436.  While this language may lend some support to the plaintiffs'

12  argument that a cap is necessary, each time the majority formulated the rule to determine if an

13  appropriation complies with the Appropriations Clause, it identified only two requirements:

14  source and purpose.  It did not require a cap.

15         The *CFSA* dissenters agree with this interpretation of the majority opinion, stating that

16  the majority's interpretation imposes no temporal limit on appropriations, "[n]or does [it] require

17

18  _____

19  displayed significant variety in their structure.  Each, however, adhered to the minimum
    requirements of an identifiable source of public funds and purpose."); *id.* at 438 ("The
20  associations offer no defensible argument that the Appropriations Clause requires more than a
    law that authorizes the disbursement of specified funds for identified purposes."); *id.* ("[A]s we
21  have explained at length, both preratification and postratification appropriations practice support
    our source-and-purpose understanding."); *id.* at 439 ("Congress controls the source and
22  disposition of the money used to finance Government operations and projects by enacting a law
    that identifies the source of public funds and authorizes the expenditure of those funds for
23  designated purposes." (quotation omitted)); *id.* at 441 ("Although there may be other
    constitutional checks on Congress' authority to create and fund an administrative agency,
    specifying the source and purpose is all the control the Appropriations Clause requires.").

1    Congress to set an upper limit on the amount of money that the Executive may take." *Id.* at 448.

2    The majority opinion does not disabuse the dissenters of this interpretation of the holding.

3            That an appropriation need not be subject to a cap is consistent with the majority opinion

4    and one concurrence's review of other agencies' funding mechanisms, including some that were

5    enacted by the First Congress, particularly, the funding of the Post Office and the Customs

6    Service. *Id.* at 432-34, 442-44.  Both were funded through revenue they collected, and neither

7    was subject to a hard cap on how much they could collect or spend. *Id.*  The only hard cap on the

8    Post Office's expenditures was on the amount the Postmaster General could pay deputy

9    postmasters. *Id.* at 434.  The *CFSA* dissent acknowledges these examples but argues that the

10   Customs Service and the Post Office are different because "funding Government agencies with

11   fees charged to the beneficiaries of their services has long been viewed as consistent with the

12   appropriations requirement." *Id.* at 465.  The dissent thereafter distinguishes the CFPB from the

13   FHFA by noting that the FHFA is funded by fees charged on the entities it regulates, suggesting

14   the dissenters would place the FHFA in the same category as Customs and the Post Office.[11] *Id.*

15   at 467.

16

17

18   [11] The dissent distinguishes the Federal Reserve Board's funding as essentially a historical
     anomaly. *Id.* at 467 n.16.  The Federal Reserve Board is funded through assessments on the
19   federal reserve banks in an amount "sufficient to pay [the Board's] estimated expenses," salaries,
     and its own building. 12 U.S.C. § 243.  There is no hard cap to the assessments, although, like
20   the FHFA, the Board must annually report on its operations to Congress. 12 U.S.C. § 247.  The
     dissent describes the Board as "a unique institution with a unique historical background" related
21   to financial panics "that were widely attributed to the country's lack of a national bank." *CFSA*,
     601 U.S. at 467 n.16.  The dissent suggests that "[f]or Appropriations Clause purposes, the
22   funding of the Federal Reserve Board should be regarded as a special arrangement sanctioned by
     history." *Id.*  But the dissent does not satisfactorily explain why a "special arrangement
23   sanctioned by history" can overcome an unconstitutional appropriation. *Id.*  And the FHFA was
     also born out of "the devastation wrought by [a] financial crisis." *See id.* at 446; *Schechter*, 295
     U.S. at 528 ("Extraordinary conditions do not create or enlarge constitutional power.").

20

In sum, under *CFSA*, all that is required to satisfy the Appropriations Clause is a designated source and purpose.  HERA satisfies those two requirements.  Consequently, the plaintiffs' Appropriations Clause claim fails as a matter of law.

### 2.  Non-delegation Doctrine

The defendants argue that the plaintiffs' non-delegation doctrine claim fails because that doctrine requires only that Congress set out an "intelligible principle to guide the delegee's exercise of authority." ECF No. 36 at 29 (quotation omitted).  The defendants argue this standard is satisfied because the FHFA's director may collect assessments annually "in an amount not exceeding the amount sufficient to provide for" the agency's "reasonable costs . . . and expenses." *Id.* (quotation omitted).  The defendants contend that HERA also provides examples of reasonable costs, such as expenses incurred in conducting examinations, credit assessments, and an amount to maintain a working capital fund.  They contend that other similar, or even more broadly worded, statutes have passed scrutiny under the doctrine.

The plaintiffs respond that allowing the FHFA's director the discretion to determine what is reasonable is an illusory limit governed only by the director's determination of what is reasonable.  They argue there are no factors for the director, Congress, or the public to apply to determine when the FHFA has collected too much because there is no limit to how much it can raise and it does not have to return any surplus to the Treasury.  They thus contend that allowing the FHFA the ability to raise and spend unlimited funds without any checks on those powers violates the separation of powers and the non-delegation doctrine.

Congress "may not transfer to another branch powers which are strictly and exclusively legislative." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (quotation omitted).  However, Congress "may confer substantial discretion on executive agencies to implement and enforce the

laws." *Id.* That is so because "in our increasingly complex society, replete with ever changing and more technical problems," the Supreme Court "has understood that Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Id.* (simplified). Consequently, "a statutory delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Id.* (simplified). I determine whether Congress has provided an intelligible principle by examining the relevant statute's language. *Id.*

HERA allows the FHFA to collect assessments "in an amount not exceeding the amount sufficient to provide for [the FHFA's] reasonable costs" along with an amount the director "deem[s] necessary . . . to maintain a working capital fund." 12 U.S.C. §§ 4516(a), (a)(3), (e). It also identifies categories of costs the FHFA can incur in carrying out its statutory duties, including compensating the director and other FHFA employees, expenses for examinations, obtaining reviews and credit assessments, and winding up affairs of certain entities. *Id.* §§ 4516(a)(1)-(4), 4516(f)(4). The Supreme Court has found similar (or even broader) descriptions of delegated power to be intelligible principles.[12]

The plaintiffs argue, however, that this case is more akin to one of the few cases in which the Supreme Court has found a violation of the non-delegation doctrine: *A.L.A. Schechter*

---

[12] *See, e.g.*, *Lichter v. United States*, 334 U.S. 742, 785-86 (1948) (upholding delegation of authority to determine "excessive profits"); *American Power & Light Co. v. SEC*, 329 U.S. 90, 104-05 (1946) (upholding delegation of authority to Securities and Exchange Commission to prevent unfair or inequitable distribution of voting power among security holders); *Yakus v. United States*, 321 U.S. 414, 420, 426 (1944) (upholding delegation to Price Administrator to promulgate regulations fixing commodity prices that, "in his judgment will be fair and equitable and will effectuate" the relevant statute's purposes); *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 600 (1944) (upholding delegation to Federal Power Commission to determine "just and reasonable" rates); *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 214, 225-26, (1943) (upholding delegation to Federal Communications Commission to regulate broadcast licensing "as public convenience, interest, or necessity" require).

1  *Poultry Corp. v. United States*, 295 U.S. 495 (1935).  In *Schechter*, the President approved a

2  "Live Poultry Code" under the National Industrial Recovery Act. 295 U.S. at 522-23.  That Act

3  provided, in relevant part, that upon application by a trade or industrial group, the President

4  "may approve a code or codes of fair competition for the trade or industry." 45 Stat. 195, 196

5  (June 16, 1933).  Once the President approved a code, that code set the relevant industry's

6  "standards of fair competition," the violation of which would constitute unfair competition under

7  the Federal Trade Commission Act. *Id.*  The Live Poultry Code's purpose was to establish "a

8  code for fair competition for the live poultry industry" in the New York City metropolitan area

9  and included various specified unfair trade practices. *Schecter*, 295 U.S. at 522-25 (quotation

10 omitted).

11      The Supreme Court held that this arrangement violated the non-delegation doctrine

12 because the trade groups could propose any code provisions so long as the code was not

13 monopolistic. *Id.* at 538.  The President could then "approve or disapprove their proposals as he

14 may see fit," as well as impose his own conditions, so long as the President found that the code

15 would promote trade or industry. *Id.*  The Act therefore "supplie[d] no standards for any trade,

16 industry, or activity," did "not undertake to prescribe rules of conduct to be applied to particular

17 states of fact determined by appropriate administrative procedure," and instead authorized that

18 codes be made without legislatively setting standards "aside from the statement of the general

19 aims of rehabilitation, correction, and expansion" of the industry. *Id.* at 541.  The Court stated

20 that "[i]n view of the scope of that broad declaration and of the nature of the few restrictions that

21 are imposed, the [President's] discretion . . . in approving or prescribing codes, and thus enacting

22 laws for the government of trade and industry throughout the country, is virtually unfettered." *Id.*

23

1    at 541-42.  The Supreme Court thus held that the Act's delegation of "code-making authority" to

2    the President was unconstitutional. *Id.* at 542.

3         The FHFA's statutory language bears no resemblance to the National Industrial Recovery

4    Act.  It does not delegate standardless authority to the FHFA.  Rather, the FHFA is directed to

5    spend its funds for reasonable expenses and to maintain a working capital fund to carry out the

6    FHFA's statutorily prescribed duties.  Although the plaintiffs contend that "reasonable" is

7    whatever the FHFA's director says it is, and that could theoretically allow the FHFA to purchase

8    gold staplers and the like, that very example defeats the plaintiffs' argument.  No one would

9    argue that gold staplers are reasonable, nor have the plaintiffs pointed to a closer question of

10    something the FHFA has actually expended funds on that would arguably be unreasonable.

11    Reasonableness is an intelligible principle, particularly in light of the fact that the FHFA must

12    annually report its operations to Congress and is subject to annual and spot audits by the

13    Comptroller General, who must report the findings of those audits to Congress. *See Fed. Power*

14    *Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944) (upholding delegation to Federal

15    Power Commission to determine "just and reasonable" rates).  The plaintiffs' non-delegation

16    doctrine claim therefore fails as a matter of law.

17         3.  Wrongful Foreclosure

18         Because the wrongful foreclosure claim is based on the alleged constitutional violations,

19    it fails as a matter of law as well.  I therefore grant the defendants' motion to dismiss this claim.

20    **III.  MOTION TO AMEND (ECF No. 52)**

21         The plaintiffs move to amend the FAC to update it in response to the *CFSA* decision and

22    to emphasize the lack of a cap as the constitutional defect.  I deny the motion because

23    amendment is unnecessary, wasteful, and futile.  The FAC already alleges that the lack of a limit

on FHFA's funding violates the constitution, so amendment is unnecessary. *See* ECF No. 34 at 2

(alleging that "FHFA has no limits on the amounts it can raise from its regulated entities" and

"Congress has not set forth any intelligible principles to constrain FHFA's discretion to demand

or spend unlimited amounts from its regulated entities").  Allowing amendment would only

delay resolution of this case and generate another round of briefing, which would merely repeat

what has already been extensively briefed, thereby wasting the parties' and this court's time and

resources.  Finally, for all the reasons set forth in this order, amendment would be futile.

**IV.  CONCLUSION**

I THEREFORE ORDER that the plaintiffs' motion to amend **(ECF No. 52) is DENIED**.

I FURTHER ORDER that the defendants' motion to dismiss **(ECF No. 36) is**

**GRANTED**.  The clerk of court is instructed to enter judgment in favor of the defendants and

against the plaintiffs, and to close this case.

DATED this 20th day of September, 2024.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE